NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240616-U

NO. 4-24-0616

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 27, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* H.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Hancock County |
| Petitioner-Appellee, | ) | No. 19JA30 |
| v. | ) | |
| Lawrence S., | ) | Honorable |
| Respondent-Appellant). | ) | Rodney G. Clark, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Grishow concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court granted appointed appellate counsel's motion to withdraw and affirmed the trial court's judgment terminating respondent's parental rights to his minor child.

¶ 2    Respondent, Lawrence S., appealed the trial court's judgment terminating his parental rights to his minor child, H.S. (born in October 2008). Counsel was appointed to represent respondent on appeal. Appointed counsel now moves to withdraw on the basis she can raise no colorable argument that the court erred in terminating respondent's parental rights to H.S. We grant counsel's motion and affirm the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4    In September 2019, the State filed an amended petition for adjudication of wardship with respect to H.S., alleging the minor was neglected pursuant to section 2-3(1)(b) of

the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)) because his environment was injurious to his welfare when residing with his mother, Kelsey C., who is not a party to the instant appeal, and her husband, Tyler C. Specifically, the State alleged that Tyler C. had an extensive history of domestic violence against both Kelsey C. and previous paramours in the presence of their children.

¶ 5        Kelsey C. stipulated to the allegations in the State's petition, and, on December 4, 2019, the trial court entered an adjudicatory order finding H.S. was neglected. On June 24, 2020, the court entered a dispositional order finding that respondent was unable to care for H.S. and making the minor a ward of the court. The court stated that respondent "was aware of the domestic violence between [Kelsey C.] and Tyler C[.] and took no steps to intervene. Respondent *** has not shown any interest in protecting the minor or being a part of his education." The court ordered that visitation between respondent and H.S. was to be at the discretion of the Illinois Department of Children and Family Services and "established visitation shall be unsupervised for respondent."

¶ 6        On April 25, 2023, the State filed a petition to terminate respondent's parental rights. The State alleged that respondent was an unfit parent within the meaning of section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)) because he failed to (1) make reasonable progress toward H.S.'s return during any nine-month period—from June 4, 2022, to March 3, 2023—following the adjudication of neglect (*id.* § 1(D)(m)(ii)) and (2) maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (§ 1(D)(b)). With respect to the second allegation of unfitness, the State asserted that "[d]espite having the opportunity for unsupervised visitation, between the dates of July 10, 2022, and March 3, 2023, Respondent Father had extremely minimal contact with the minor child."

¶ 7        The trial court conducted a fitness hearing on December 1, 2023, and January 30, 2024. The State called Bethany Greenwood as its only witness, and respondent testified on his own behalf.

¶ 8        Bethany Greenwood had been the minor's caseworker since June 2022. She testified that H.S. was 15 years old at the time of the hearing and initially came into care in September 2019 due to an incident of domestic violence between Kelsey C. and Tyler C. Although respondent did not participate in the October 2019 integrated assessment, a service plan was nonetheless created for him. Respondent's service plan required him to cooperate with the caseworker, regularly visit with H.S., and maintain adequate housing and employment. Greenwood testified that she was never able to review the service plan with respondent, despite sending him repeated text messages and making several unannounced visits to his house. For instance, when Greenwood went to respondent's house in August 2022 to give him the rated service plan, respondent opened the door and told her "that he was not a party to this case and did not have to speak to [her] and closed the door." She further indicated that she had no contact with respondent between June 2022 and March 2023.

¶ 9        Greenwood testified that respondent received only "unsatisfactory" ratings on his service plan during the relevant time frame. Greenwood indicated that respondent failed to cooperate with her by refusing to "meet[ ] on a scheduled and unscheduled basis" and refusing to provide her with a copy of his driver's license and proof of insurance, which  were required for him to give H.S. rides. Respondent likewise failed to maintain regular visitation with the minor. Greenwood testified that respondent was "allowed to participate in [an] unlimited amount of visitation with [H.S.] He could have [H.S.] spending overnights if he wanted to; picking him up from school. It's completely unlimited unsupervised." However, between June 2022 and July

2022, respondent saw H.S. only when he would give the minor a ride to respondent's mother's house on Fridays and return him to his foster home on Sundays. Then, after respondent lost the privilege to give H.S. rides in July 2022 due to his refusal to provide the necessary paperwork, he visited with H.S. only twice between July 2022 and March 2023—once on H.S.'s birthday in October and once on Christmas Day. Lastly, respondent received unsatisfactory ratings with respect to the housing and employment requirements because he refused to let Greenwood into his house and refused to provide her with a copy of his paystub. Greenwood provided the following response when asked to articulate her "biggest concern regarding [respondent's] ability to provide permanency for [H.S.]:"

> "A. [Respondent] has allowed [H.S.] to be in foster care for over four years. He was given unlimited unsupervised visitation since June of 2020. And he did not take advantage of that at all. He could've had [H.S.] home with him in a very reasonable amount of time, and yet he's still allowing [H.S.] to be in foster care."

¶ 10      Respondent testified that he was employed by Western Grain Marketing. As part of his job, respondent loaded corn into train cars. He was required to "walk on top of the train" and therefore could not answer his phone because doing so would constitute a safety violation. Respondent testified that he worked five to seven days per week from approximately 7 a.m. to 5 p.m. He further testified that he had allowed a previous caseworker to inspect his home and had also provided that caseworker with one of his paystubs. Respondent acknowledged that he had received "a handful" of text messages from Greenwood between June 2022 and March 2023, but he claimed the messages "were limited." With respect to visitation with H.S., respondent testified that he was told he could not pick up the minor "because I wouldn't give out my

identity. I had identity thefts [*sic*] so I was told I wasn't to give my ID out." On cross-examination, respondent indicated that he refused to cooperate with Greenwood, despite having cooperated with the initial caseworker, because "[w]orking with multiple people just isn't something that is comfortable with people with autism. I don't feel comfortable with somebody I can't get along with them." Respondent also acknowledged that he did not respond to any of the text messages sent by Greenwood.

¶ 11 After the hearing, the trial court entered a written order finding the State had proven respondent unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare; the court did not make a finding with respect to the State's additional alleged ground for unfitness. In support of its unfitness finding, the court noted that respondent "had very few requirements to comply with in order for [H.S.] to be placed in his care," yet respondent still refused to cooperate with the caseworker. The court also highlighted the fact that respondent failed to take advantage of his ability to have unsupervised visits with H.S.: "[Respondent] had a house, a vehicle, and a job. He had everything he needed to provide for [H.S.] The thing he didn't have seemed to be the desire to actually have [H.S.] in his care."

¶ 12 The trial court conducted a best-interest hearing on April 2, 2024. Brittany Miller testified that she prepared a best-interest report for the hearing, which was admitted into evidence. Miller testified that H.S. had been placed with his maternal grandparents since the case was opened in September 2019, and his two younger siblings lived with him in the same home. Miller testified that the foster home was appropriate and the grandparents were able to provide for the minor's needs. She further indicated that she had observed a bond between H.S. and his grandparents. Miller testified that H.S. has "some special needs in association with autism," and she had no concerns with the grandparents' ability to meet those needs. She also noted that H.S.

stayed with his paternal grandmother every other weekend, and his foster parents wanted to ensure that H.S. maintained that relationship. Miller could not provide an opinion as to whether respondent was capable of caring for H.S. because respondent would not respond to her attempts to contact him, and she therefore was never able to meet with him. Miller opined that H.S.'s placement with his maternal grandparents was the least disruptive placement alternative and that removal from the foster home would have a negative impact on his development. Miller testified that the foster parents had "signed permanency commitment forms, and they have already done all of their paperwork for [H.S.'s] other siblings."

¶ 13 Mandy Humphry testified that she also prepared a best-interest report for the hearing, and it was admitted into evidence. Humphry was asked "what sort of things did [she] believe to be important for the Court to know about [H.S.] and permanency for him," and she provided the following response:

"A. That he is—he likes a sense of routine and knowing where he's at and what he's doing and so he has that where he's at. He seems to be comfortable, well cared for. They know what his favorite foods are and go out of their way to make those favorite foods. He has grown a little bit in this last year, and they made sure to go through his clothes that were too small and get him bigger clothes. So they take care of, you know, all the basic things that need to be taken care of. But also Christmastime, they included him in going on a family outing.

So if they were to ask him: 'Do you want to go see the Christmas lights?' He would probably say no, but they know that's good for him. And so they will just say you're going and coming—look at the Christmas lights with us. And so they'll, you know, take him on family outings to be a part of doing those things

together. So they encourage him to not just stay in his room and play video games."

¶ 14　　Donna H., H.S.'s maternal grandmother and foster parent, testified that H.S. and his two younger siblings had been living with her and her husband for approximately four years. She testified that H.S. shared a bedroom with his younger brother, and there had never been any issues with that arrangement. Donna described their daily routine and how they have implemented various processes to help H.S. cope with his autism. She testified that H.S. is bonded with his siblings even though he rarely expresses his emotions outwardly. She further testified that she would ensure that H.S. was able to continue to visit with his paternal grandmother every other weekend, and she and her husband wished to provide a permanent home for H.S. Donna stated that their main short-term goal for H.S. was to teach him to drive "because he's just not real crazy about getting that driver's license and that's because of his autism." She testified that H.S. never asked her about respondent.

¶ 15　　Respondent testified that his interactions with H.S. prior to the case opening were "okay for the most part to my understanding." However, he acknowledged that H.S. was "[n]ot exactly" bonded with him: "He knows I'm dad. He knows I'll always be dad, but the father-son relationship isn't exactly there. He's into, like, video games and stuff like that, and I like to be outside or doing something and so I just kind of let him do his own thing." Respondent testified that he would be able to provide for the minor's "food, shelter, health, and clothing" needs. On cross-examination, respondent testified that it had "been some time ago" since H.S. last stayed at his house. Respondent could not say when the last time was that he had attended one of H.S.'s educational or medical appointments. When asked how he would care for H.S. given his busy

work schedule, respondent stated, "Well, he's old enough that he normally takes care of himself for the most part."

¶ 16    The trial court found that termination of respondent's parental rights was in H.S.'s best interest, and it provided the following reasoning in open court:

"THE COURT: With regard to his physical safety, which is welfare, that's with the Hilands; that's where he's been since 2019. This Court, me, I've been associated with this case since 2019. I know every aspect of the case, and I know everything, in my opinion, with regard to [H.S.] and that he is safe where he is. His identity is with them. They are his grandparents, and they've become his parents over the last five years. He's attached to them. He knows them. That's where he feels love. That's where he has siblings. That's where he has security. That's where he has affection. It's truly the least disruptive placement for him.

As far as his wishes, I think that [H.S.] has talked through a variety of people that his wishes are to stay exactly where he is and to be able to visit his other grandparent accordingly.

He has ties to that house. He has ties to that community. He has ties to the school. There needs to be permanency for him. There is always risk, but I think the risk is definitely outweighed by permanency."

¶ 17    Respondent appealed, and the trial court appointed counsel to represent him on appeal. Appointed counsel now moves to withdraw on the basis she can raise no colorable argument that the court erred in terminating respondent's parental rights. We granted respondent leave to file a response to counsel's motion on or before October 21, 2024. Respondent did not file a response.

¶ 18                    II. ANALYSIS

¶ 19        On appeal, appointed counsel moves to withdraw on the basis she can raise no colorable argument that the trial court erred in terminating respondent's parental rights to H.S.

¶ 20        Before reaching the merits, we must address the timeliness of our decision. Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018) provides that in child custody cases, "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Here, the notice of appeal was filed on April 5, 2024, which means our decision was due on September 3, 2024. However, respondent sought and received multiple continuances in this court, and the case was not submitted for our review until October 22, 2024. Therefore, we find good cause exists for issuing our decision after the expiration of the 150-day deadline imposed by Rule 311.

¶ 21                    A. The Unfitness Finding

¶ 22        First, counsel asserts she can raise no colorable argument that the trial court erred in finding respondent unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to H.S.'s welfare. "A reviewing court will not reverse a trial court's fitness finding unless it was contrary to the manifest weight of the evidence, meaning that the opposite conclusion is clearly evident from a review of the record." *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011).

¶ 23        Section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29 (West 2022)) "delineates a two-step process in seeking termination of parental rights involuntarily." *In re J.L.*, 236 Ill. 2d 329, 337 (2010). First, the State must prove by clear and convincing evidence that the parent is unfit. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). Under the Adoption Act, an unfit parent includes any parent who fails "to maintain a reasonable degree of interest, concern or

responsibility as to the child's welfare." 750 ILCS 50/1(D)(b) (West 2022). "[I]n examining allegations under subsection (b), a trial court must focus on a parent's reasonable efforts and not her success, and must consider any circumstances that may have made it difficult for her to visit, communicate with or otherwise show interest in her child." *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004). "If personal visits with the child are somehow impractical, letters, telephone calls, and gifts to the child or those caring for the child may demonstrate a reasonable degree of concern, interest and responsibility, depending upon the content, tone, and frequency of those contacts under the circumstances." *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990). "However, our courts have repeatedly concluded that a parent is not fit merely because she has demonstrated some interest or affection toward her child; rather, her interest, concern and responsibility must be reasonable." *Jaron Z.*, 348 Ill. App. 3d at 259. "Noncompliance with an imposed service plan *** and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under subsection (b)." *Id.*

¶ 24 Here, the evidence presented at the fitness hearing supports the trial court's finding of unfitness. Bethany Greenwood, H.S.'s caseworker, testified that respondent's service plan required him to cooperate with the caseworker, regularly visit with H.S., and maintain adequate housing and employment. However, Greenwood was never able to review the service plan with respondent because he refused to cooperate with her, despite her repeated efforts to contact him. For instance, when Greenwood went to respondent's house in August 2022 to give him the rated service plan, respondent opened the door and told her "that he was not a party to this case and did not have to speak to [her] and closed the door." Greenwood testified that respondent received only "unsatisfactory" ratings on his service plan during the relevant time frame. Respondent failed to cooperate with Greenwood by refusing to meet with her and by

refusing to provide her with a copy of his driver's license and proof of insurance. Due to his refusal to provide Greenwood with this documentation, respondent lost the ability to give H.S. rides. Respondent also failed to exercise regular visitation with H.S. Despite being entitled to an "unlimited amount of visitation," respondent visited with H.S. only twice between July 2022 and March 2023—once on H.S.'s birthday in October and once on Christmas Day. Moreover, respondent received unsatisfactory ratings with respect to the housing and employment requirements because he refused to let Greenwood into his house and refused to provide her with a copy of his paystub. The evidence presented at the fitness hearing clearly established that respondent failed to comply with any of the requirements imposed by his service plan and that he only visited with H.S. on a very infrequent basis. See *Jaron Z.*, 348 Ill. App. 3d at 259 ("Noncompliance with an imposed service plan *** and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under subsection (b)."). Accordingly, we agree with counsel that no colorable argument can be made that the court's unfitness finding was against the manifest weight of the evidence.

¶ 25                        B. The Best-Interest Determination

¶ 26        Next, counsel asserts she can raise no colorable argument that the trial court erred in finding termination of respondent's parental rights was in H.S.'s best interest. We will not reverse a best-interest determination absent a finding it was against the manifest weight of the evidence, which occurs "only if the facts clearly demonstrate that the court should have reached the opposite result." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

¶ 27        If the State satisfies its burden of proving the respondent unfit, the proceedings advance to the second stage, where the State must prove by a preponderance of the evidence that termination of parental rights is in the minor's best interest. 705 ILCS 405/2-29(2) (West 2022).

- 11 -

At the best-interest stage, the focus shifts from the parent to the child, and the issue is "whether, in light of the child's needs, parental rights should be terminated." (Emphasis omitted.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). Thus, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* Section 1-3 of the Juvenile Court Act lists the best-interest factors for the court to consider, in the context of the minor's age and developmental needs, when making its best-interest determination: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties; (4) the child's sense of attachments; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence; (8) the uniqueness of every family and child; (9) the risks associated with substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2022).

¶ 28 Here, the evidence presented supports the trial court's best-interest determination. H.S., along with his two younger siblings, had been living with his maternal grandparents since the case was opened in September 2019. Brittany Miller and Mandy Humphry, both of whom prepared best-interest reports, testified that the foster parents were able to consistently meet all of H.S.'s physical, emotional, and educational needs. They had both also observed H.S. to be bonded with his foster parents. Respondent, on the other hand, testified that "the father-son relationship [between him and H.S.] isn't exactly there." Donna H., H.S.'s maternal grandmother and foster parent, testified that H.S. never asked about respondent. She testified that she and her husband wished to provide permanent care for H.S. She further testified that she would ensure H.S. was able to continue staying with his paternal grandmother every other weekend. When respondent was asked how he would care for H.S. given his busy work schedule, he merely stated, "Well, he's old enough that he normally takes care of himself for the most part." Both

Miller and Humphry opined that removing H.S. from his current placement and separating him from his siblings would have a negative impact on his development. Accordingly, based on this evidence, we agree with counsel that no colorable argument can be made that the court's best-interest determination was against the manifest weight of the evidence.

¶ 29                                    III. CONCLUSION

¶ 30        For the reasons stated, we grant appointed appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 31        Affirmed.